See Concurring Opinion

Filed 7/26/24  In re W.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re W.L., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083331 |
| Plaintiff and Respondent, | (Super.Ct.No. J289047) |
| v. | OPINION |
| C.D. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant C.D.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant Z.L.

Tom Bunton, County Counsel and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

A mother and father appeal from orders terminating parental rights over their minor child and selecting adoption as the child's permanent plan. They argue the juvenile court erred by failing to apply the beneficial parental relationship exception to adoption based on mother's relationship with the child. They also argue the county welfare department's inquiry into their child's possible Indian ancestry under the Indian Child Welfare Act of 1978 (ICWA) was inadequate.[1] We reject both arguments and affirm.

FACTS

Appellants are the mother and father of W.L. (born Feb. 2021). Both parents have long struggled with substance abuse, and particularly abuse of methamphetamines. Plaintiff and respondent San Bernardino County Department of Children and Family Services (department) filed a dependency petition in May 2021, alleging the child came within section 300, subdivision (b)(1) (failure to protect), because of the parents' substance abuse issues, the failure by each to protect the child from substance abuse by the other, as well as mother's "long criminal history," much of which relates to substance

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. "In addition, because ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1. (*Benjamin M.*).)

abuse.  Father, too, had a substantial criminal history, but the department did not include any allegation about it in the petition.

In a previous dependency, mother failed to reunify with the child's older half-sibling, her parental rights were terminated, and the half-sibling was adopted.  Mother voluntarily gave up two other half-siblings for adoption by the same family that adopted the oldest child.  Her parental rights were terminated as to those two half-siblings, too.  Thus, the dependency petition here also alleged the child came within section 300, subdivision (j) (abuse of sibling).

Nevertheless, the department initially recommended the child remain in parental care on a family maintenance case plan.  The parents had been living with mother's grandmother (maternal great grandmother) for one or two months, and the home appeared appropriate in all respects, with "no traces of alcohol or substances."  The child appeared healthy, with no signs of abuse or neglect.  Maternal great grandmother reported the parents had been sober, and that she believed mother's behavior had changed for the better.  Both parents had been arrested on substance-related charges in October 2020, but had since passed drug tests, and mother had signed up for an outpatient treatment program.  The maternal great grandmother said she would never allow the parents to use substances in her home, and she agreed to contact the department if she believed the child was in danger.

With a few wording changes to conform the allegations to the proof, the juvenile court sustained the dependency petition.  The court ordered the child to remain in

parental custody on a family maintenance plan, conditioned on the parents continuing to live with a relative.

In July 2021, the department filed a supplemental dependency petition under section 387, alleging father had relapsed and been discharged from his drug treatment program. The previous month, father had missed a number of drug tests, claiming without documentation that he was unable to provide a urine sample. Later in the month, his outpatient substance abuse program reported he had tested positive for methamphetamine and marijuana in April, May, and June 2021. Father admitted to the social worker that he had relapsed.

In several visits to the maternal great grandmother's home, however, the social worker found no safety concerns and the child appeared healthy. Mother told the social worker she was staying clean, testing, and participating in services. During the social worker's visits, father was not in the home. At first, mother said he was staying during the week with his grandmother, to facilitate getting to work despite their lack of transportation. Later, mother said he was no longer staying in the home at all, which father separately confirmed. Mother and the maternal great grandmother both agreed father would not be allowed back in the home, either to reside there or for visits. The department recommended the child be detained from father but remain in mother's care.

At the July 2021 detention hearing on the supplemental petition, the juvenile court followed the department's recommendation, detaining the child from father, but leaving

4

her in mother's care.  The court ordered reunification services and supervised visitation for father, and ordered mother "not to supervise or arrange visits."

Before the jurisdiction and disposition hearing on the supplemental petition, however, mother violated that court order.  At an unannounced visit to the family home, the social worker saw father there, despite both parents' efforts to conceal him.  Mother had "maintained sobriety," but the social worker believed father was intoxicated.  Mother said father had come unannounced and that "she does not know what to do" when he does so.  The social worker reported mother "appeared to meet all of the child's needs while in her care," but by allowing father "unlimited access" to the child she placed the child "at risk of harm and danger."  On August 12, 2021, mother consented to the child's "voluntary temporary removal" by the department without a court order.  A few days later, the department filed a supplemental petition under section 387 as to mother.

At a September 2021 combined jurisdiction and disposition hearing on both section 387 petitions, the juvenile court sustained the petitions and ordered the child removed from both parents.  It ordered family reunification services and supervised visitation for both parents.

Father did not do well, failing to visit with the child or participate in services, both before and after his incarceration in February 2022.  His reunification services were terminated at the March 2022 six month review hearing.

Mother did better, participating in services, testing negative for controlled substances, and visiting regularly and appropriately with the child, including

unsupervised visitation. She told the social worker, however, that she had been "drinking alcohol and cannot stop." That drinking had not been detected in testing, but there was "concern that she could be drinking alcohol after her drug test." At the six month review hearing, the court ordered continued services for mother, and it authorized further liberalization of visitation once the department confirmed there was no alcohol in mother's home and that she was not using alcohol around the child.

At the next review hearing, in September 2022, the department recommended the child be returned to mother's care on a family maintenance plan. Mother had continued to participate in services and to test negative for controlled substances. There were no concerns about her visitation, which included unsupervised visits. The court accepted the department's recommendation, ordering the child be placed in mother's care and that she receive family maintenance services, on the condition that there be no unauthorized contact between the child and father. The court ordered the department to devise a "safety plan" to "make sure [mother] is exercising protective capacity" and review the plan with mother.

Mother continued to do well through the next review period. In February 2023 the department recommended continued family maintenance services for mother, and the juvenile court adopted that recommendation.

In June 2023, however, mother tested positive for amphetamines and missed another test. She initially blamed the positive test on prescription medication, but she failed to produce proof. After a missed test in July 2023, and further inquiry by the social

worker, mother admitted to "'snorting meth'" one time. She said she had a friend pick up the child from preschool that day, and the child was not dropped off at mother's home until she was no longer under the influence. On July 31, 2023, mother consented to the department again temporarily removing the child from her care without a court order and placing the child with her former foster parents, with whom mother had "a positive relationship."

Several days later, the department filed a supplemental dependency petition. Mother had mostly completed her case plan and had "a positive relationship" with the child, who appeared "comfortable and happy in her care." But mother had failed to maintain sobriety; she admitted using amphetamines once, and the department "now believe[d]" missed drug tests, previously attributed to her work schedule, suggested substance abuse. Per the department's recommendation, the juvenile court sustained the supplemental petition, removed the child from mother's care, and terminated mother's services. The court ordered mother to have a two-hour visit each month, but gave the department authority to increase frequency and duration of visitation.

The child thrived in the care of her foster parents, who were also prospective adoptive parents. The social worker described her as an apparently "happy child" who "does not exhibit any emotional issues." The social worker observed the child "is bonded to the prospective adoptive parents," who had been her primary caretakers for most of her life, from August 2021 to August 2022, and again since July 31, 2023.

Between the child's removal on July 31, 2023 and November 2023, mother visited with the child only once, on August 18, 2023. Mother was offered "make up visits" in August and September, but she "gave excuses and asked to change the dates after she had agreed upon them." She missed the October 2023 monthly visit, and there is no record evidence she visited in the following November, December, or January. At the selection and implementation hearing in February 2024, the juvenile court found the child both generally and specifically adoptable, found no exceptions to adoption applied, and terminated mother's and father's parental rights.

## DISCUSSION

A. *Beneficial Parental Relationship Exception to Adoption*

The parents argue the juvenile court should have applied the beneficial parental relationship exception to adoption, based on mother's relationship with the child, instead of terminating parental rights.[2] We are not persuaded.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for a dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53.) "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care." (*Id.* at p. 53.) "Whenever the court

---

[2] Father joins mother's arguments on appeal, but neither parent argues father's own relationship with the child would justify application of this exception.

8

finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.'" (*Ibid.*)

To avoid termination of parental rights, a parent must prove one or more statutory exceptions apply. (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) "One of the exceptions, the beneficial parental relationship exception, applies when (1) 'the parent has regularly visited with the child'; (2) 'the child would benefit from continuing the relationship'; and (3) terminating the relationship would be detrimental to the child.'" (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1183 (*M.V.*); see § 366.26, subd. (c)(1)(B)(i).) "A parent must prove *all three* components of the beneficial relationship exception. A failure of proof on any one of them is fatal." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Second, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) "Again here, the focus is on the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633-634.)

"We review the court's findings using a hybrid approach: for the first two elements, which require factual findings (parental visitation and the child's emotional attachment), we apply the substantial evidence standard of review." (*M.V.*, *supra*, 87 Cal.App.5th at p. 1184.) But where the juvenile court found the parent failed to carry his or her burden of proof, the question is more properly stated not in terms of substantial evidence, but rather "whether the [appellant parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

We apply the abuse of discretion standard to the juvenile court's "weighing of the relative harms and benefits of terminating parental rights" for the third element (*M.V.*, *supra*, 87 Cal.App.5th at p. 1184), though the substantial evidence standard applies for any factual determinations made here as well. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

We will not reverse the juvenile court's order as an abuse of discretion unless the court made an arbitrary, capricious, or patently absurd determination. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

"At its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

Substantial evidence supports the juvenile court's finding that mother did not "'visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Indeed, the record compels that conclusion. Certainly, after the child was removed from mother the first time, she was consistent in her visitation. After the second removal on July 31, 2023, however, she visited with the child only once, in August 2023, despite efforts to schedule "make up" visits. As a result, by the February 2024 hearing, mother had gone most of six months without seeing the then-three-year-old child. Even considering the limited visitation allowed to her at that time, the department's characterization of mother as "inconsistent with visits" was understatement. Thus, regardless of any evidence in support of the other elements, the juvenile court was correct to find the beneficial parental relationship exception does not

11

apply here.[3] (*In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 322, fn. 10; *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068 [where parent did not prove regular visitation, reviewing court need not consider the other elements of the parental-benefit exception].)

B. *ICWA*

1. *Additional facts*

Mother and father both denied any Indian ancestry. The department and the juvenile court also asked several extended relatives about Indian ancestry, including a maternal great grandmother, a maternal great grandfather, the maternal grandmother, a maternal uncle, and the paternal grandfather. Each of these relatives denied any Indian ancestry.

Mother told the department the name of her father, the child's maternal grandfather, and said that he was "incarcerated at Oregon State Prison and she does not have a relationship with him." The record does not reflect that the department attempted to use that limited information to contact the maternal grandfather, and it is undisputed that the maternal grandfather was never asked about Indian ancestry.[4] Judging by shared last names, the maternal great grandparents who were asked about Indian ancestry are

---

[3] We note briefly, nevertheless, that there is little if any record evidence in support of mother's assertion the juvenile court abused its discretion as to the third element. Mother's extended absence from the child's life, combined with record evidence the child was nevertheless thriving, is strong evidence that formally severing the parental relationship would not be so harmful to the child as to outweigh the benefits of adoption.

[4] One report mistakenly states that the "maternal grandfather" was asked about possible Indian ancestry. The relative identified by name in that report is a maternal great grandfather, not the maternal grandfather.

mother's maternal grandparents. There is no indication in the record that her paternal grandparents were available for inquiry.

2. *Analysis*

The parents argue the department failed to satisfy its ICWA duty of initial inquiry because mother's father, the child's maternal grandfather, was not contacted. We disagree.

"We generally review ICWA findings for substantial evidence." (*In re J.K.* (2022) 83 Cal.App.5th 498, 504.) Where, as here, the material facts are undisputed, we review independently whether ICWA requirements were satisfied. (*Ibid.*)

ICWA establishes minimum national standards "for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.) Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, at p. 566.) Only the initial duty is at issue in this appeal.

The question of whether the department's initial duty requires inquiry of extended family members in every case where a child is removed from home is pending before our Supreme Court. (See *In re Ja.O.* (2023) 91 Cal.App.5th 672, rev. granted July 26, 2023,

13

S280572 [lead case].)  In this case, however, our disposition would be the same no matter how that question is answered.

If the department's initial inquiry duty did not include extended relatives, there was simply no need for it to contact the maternal grandfather, and there was no ICWA error.

If the department's initial inquiry duty included interviewing extended family, more analysis is required.  An initial inquiry including a number of extended family members, but omitting one, could be reviewed to determine whether it is error at all or, instead, whether it was harmless error.  We will do both.

First, as a general matter, the department's initial inquiry does not need to be exhaustive to be adequate.  (*In re K.H.* (2022) 84 Cal.App.5th 566, 603 ["requiring an adequate initial inquiry be conducted and documented in the record should not translate into an exhaustive inquiry to ensure '[no] stone is left unturned'"].)  The department must make "*reasonable* and diligent efforts to conduct the required inquiry and report those efforts and the results thereof to the court." (*In re J.K.*, *supra*, 83 Cal.App.5th at p. 508, fn. 7.)  To be reasonable, the initial inquiry should include investigation of any "*readily obtainable information* tending to shed meaningful light on whether a child is an Indian child." (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 739 (italics added).)  But the department is not obliged to take extraordinary measures to uncover information that is not readily obtainable.  (See *In re J.K.*, *supra*, 83 Cal.App.5th at p. 508, fn. 7 ["County welfare department employees conducting the initial inquiry compelled by section 224.2

14

need not undergo overly voluminous record searches, attend family reunions, conduct stakeouts, or search Ancestry.com"].)

We find the department's investigation reasonable and diligent, even though the department did not contact the maternal grandfather. Mother provided the department his name and the general information that he was incarcerated in "Oregon State Prison," but did not provide more specific contact information. (Cf. *In re Ricky R.* (2022) 82 Cal.App.5th 671, 680 [finding prejudicial error where department had contact information for several extended family members but did not ask about Indian ancestry].) At the initial inquiry stage, in our view, the department was not obliged to make extraordinary efforts to verify mother's statements and attempt to track down specific contact information for the maternal grandfather.

Our conclusion is supported by *In re Antonio R.* (2022) 76 Cal.App.5th 421 (*Antonio R.*), a case mother describes in briefing as "reiterating [the] department's statutory duty" to inquire of extended relatives. In *Antonio R.*, the court of appeal found the county welfare department erred by failing to ask a handful of readily available extended family members about a dependent child's possible Indian ancestry. (*Antonio R.*, at p. 431.) The court excluded from its analysis, however, several other relatives for whom the parent could not provide contact information, and who were not otherwise participating in the proceedings. (*Id.*, at p. 430 & fn. 6.) Other caselaw is in accord. (See, e.g., *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 ["While we believe it reasonable in many cases to require [the county welfare department] to follow up on leads provided

15

by the parents, we cannot ask the agency . . . to interview individuals for whom no contact information has been provided]; *In re S.S.* (2023) 90 Cal.App.5th 694, 704-705 ["The Legislature's intent . . . was that agency caseworkers ask an added question of extended family members whom caseworkers are often already are investigating in their usual course of work."].)

Here, too, the proper "focus" (*Antonio R.*, *supra*, 76 Cal.App.5th at p. 431) in determining the adequacy of the department's initial inquiry is the child's extended relatives who were readily available for inquiry. The maternal grandfather was not readily available.

We would reach the same conclusion if we assumed error and analyzed for prejudice. In this area, too, the law is unsettled. The courts of appeal have taken differing approaches to analyzing prejudice from ICWA inquiry errors, and the question has been taken up by our Supreme Court. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777-782, rev. granted Sept. 21, 2022, S275578.) We would apply the approach we described in *Benjamin M.*, which asks whether the agency failed "to investigate *readily obtainable* information tending to shed meaningful light on whether a child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 739 (italics added).) As discussed, any information the maternal grandfather might have had was not readily obtainable.

## DISPOSITION

We affirm the juvenile court's orders terminating parental rights and selecting adoption as the child's permanent plan.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
J.

I concur:

McKINSTER_____
Acting P. J.

[*In re W.L.*, E083331]

MENETREZ, J., Concurring:

I concur in the judgment and in the majority opinion except for the discussion of inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA). I continue to agree with *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743, that the duty of extended family inquiry under subdivision (b) of section 224.2 of the Welfare and Institutions Code does not apply if the children were removed pursuant to a protective custody warrant. For the reasons explained in *In re D.M.* (2024) 101 Cal.App.5th 1016, I remain unpersuaded by *In re Delila D.* (2023) 93 Cal.App.5th 953, review granted September 27, 2023, S281447, and cases following it. I therefore believe that the extended family inquiry duty was not triggered in this case, so appellants have not shown any error in the ICWA investigation.

MENETREZ_____

J.

1